**SCOTT et al. v. POWELL et al., and four other cases.**

Nos. 10174–10178.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 13, 1950.

Decided March 22, 1950.

Mr. Frederick A. Ballard, Washington, D. C., with whom Messrs. H. Cecil Kilpatrick and Charles A. Webb, Washington, D. C., were on the brief, for appellants Chelly Burney Boykin, et al.

Mr. John Geyer Tausig, Washington, D. C., with whom Mr. Henry F. Butler, Washington, D. C., was on the brief, for appellant Lillian Garnett Brand. Mr. Fred J. Rice, Washington, D. C., entered an appearance for appellant Lillian Garnett Brand.

Messrs. Henry H. Glassie and Thomas M. Cooley, II, Washington, D. C., with whom Mr. Christopher B. Garnett, Washington, D. IC., was on the brief, for appellees Scota Boykin Powell, et al.

Messrs. John E. Larson and Llewellyn C. Thomas, Washington, D. C., entered appearances for appellee American Security & Trust Co.

Mr. Merle Thorpe, Jr., Washington, D. C., with whom Mr. James C. Rogers, Washington, D. C., was on the brief, for appellants Frank Kernochan Scott, et al.

Mr. Thomas H. Patterson, Washington, D. IC., for appellants Thomas Stuart Garnett, et al.

Mr. Spencer Gordon, Washington, D. C., with whom Mr. Fred J. Rice, Washington, D. C., was on the brief, for appellant Rose Kirkpatrick Howat Garnett.

Before PRETTYMAN, FAHY and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

The trustee under the will of Alice Evelyn Garnett brought a civil action in the District Court of the United States for the District of Columbia for construction of the will. From judgment in that action five appeals were taken.

Mrs. Garnett reserved from the general provisions of her will certain real estate in the District of Columbia. She devised this real estate to a trustee, directing it to divide the net income arising therefrom equally among her three children, William, Evelyn and Rita, so long as they or any of them should live, with a survivorship provision as to any child dying without lineal descendants. The disposition of the principal upon the termination of the trust was as follows: "Upon the death of all of my children, I give, devise and bequeath all of my trust, estate, in fee simple, and free of this trust, to my grandchildren, or their descendants that shall then be living, my said grandchildren, or their descendants to take per stirpes and not per capita, or in other words, to inherit the portion of my estate that would pass to their parents if I

had died intestate." (This punctuation is precisely as in the original.) There was no other clause dispositive of this property.

The controversy concerns the disposition of the principal of the trust estate under the foregoing quoted provision.

Mrs. Garnett died in February, 1922. Surviving her were three children and one grandchild. One son, William H. Garnett, was then 54 years of age and had been married for fourteen years. The other son, Evelyn S. Garnett, was 52 years old and had been married for twelve years. The daughter, Mrs. Rita G. Boykin, was 61 years old and had been a widow for twenty years. The grandson, Aubrey Boykin, the son of Rita, was a mental incompetent, then in an institution, and he died intestate, unmarried and without issue in September, 1922. William Garnett died without issue in 1938, leaving his wife as his residuary devisee, and she assigned her interest to three cousins of her husband. Evelyn Garnett died without issue in 1943, leaving his wife as his residuary devisee. Mrs. Rita Boykin died without surviving issue in 1946, leaving as her residuary devisees four nieces of her husband.

The District Court held that Aubrey Boykin had a vested remainder in the principal of the trust estate, subject to divestment if he were survived by descendants; that, since he was survived by no descendants, his interest passed to his sole heir, who was his mother, Rita Boykin; that when Mrs. Boykin died this interest passed by her will to her residuary devisees; and that, therefore, these four devisees took the whole of the trust property.

Six groups of parties are involved. Appellees are the residuary devisees of Mrs. Rita Boykin. The appellants and their contentions are as follows:

In No. 10174 appellants are the assignees of the widow and residuary devisee of William Garnett. They contend that Aubrey's remainder was divested by his death without issue during the lives of the life tenants; that the remainder thereupon reverted to the heirs of the testatrix and their successors; and that they (appellants), being

successors to one of the three heirs of the testatrix, take one-third of the property.

In No. 10175 appellants are heirs at law of Mrs. Rita Boykin. They contend that since the original testatrix did not provide for the disposition of the principal of the trust estate in the event that there were no living grandchildren or descendants of grandchildren at the time of the death of the last of the life tenants, a possibility of reverter remained in her estate; that this possibility descends but cannot be devised or assigned; that the possibility descended to the three children of the testatrix but, upon the death of two children, passed to Rita as the survivor of the three; that this interest remained only a possibility until Rita's death, because of the conclusive presumption of law that she might at any time have had another child; and that upon Rita's death this possibility descended to her heirs as tenants in common.

In No. 10176 the appellant is the widow and sole residuary devisee of Evelyn Garnett. She contends that the original testatrix failed to provide for the disposition of the principal of the estate in the events which have transpired; that the interest, whatever it was, descended to the testatrix's three children; that the interest of Evelyn Garnett passed under his will; and that, therefore, she is entitled to one-third of the trust property.

In No. 10177 appellants are five grandchildren of two half sisters of the testatrix; thus, they are grandnieces and grandnephews of the testatrix. They contend that, if the will made a complete disposition of the property, on the death of the last life tenant (Rita Boykin) a resulting trust arose in favor of the heirs of the testatrix determined as of that date, and, on the other hand, that if any portion of the property remained in the testatrix that interest was a possibility of reverter which was not descendable; that thus, in either event, the heirs of the testatrix, determined as of the date of the death of the last life tenant, take the whole of the trust property.

In No. 10178 the appellant is an heir at law of Rita Boykin, and if Rita Boykin is

eliminated from consideration as the heir of Aubrey, this appellant becomes an heir at law of Aubrey Boykin. She makes alternative contentions. First, she contends that the word "descendants" in the will of the testatrix should be construed to mean heirs and that, therefore, Aubrey's remainder vested in his heirs who were living at the death of the last surviving life tenant; that these heirs should be determined according to the law which was in effect at the date of the death of the original testatrix;[1] that this law would limit such heirs to those of his grandfather on his maternal side; and that this appellant is entitled to one-half of the estate, because she is the sole heir of one of the two brothers of Aubrey's maternal grandfather. In the alternative, this appellant says that she is also one of the heirs of Rita Boykin, and, as such, she adopts the contentions made by the appellants in No. 10175; that in this event she is entitled to one-fourth of the trust property, since the law at the date of Rita Boykin's death provided that her descending property be divided equally between her paternal and her maternal branches and this appellant is entitled to one-half of the interest of the paternal branch.

It would unduly prolong this opinion to attempt to discuss all of the various contentions of the several parties. We, therefore, shall content ourselves with stating the rules which we consider to be applicable and which lead us to our conclusion.

█ The first problem is to determine the nature of the interest of Aubrey and what happened to it when he died. In terms of the law of future interests, there are alternative limitations and supplanting limitations. Such terms are defined in Sections 252 and 253 of the Restatement of the Law of Property. An alternative limitation requires survival of the remainderman to the end of the preceding interests. A supplanting limitation does not necessarily require such survival of the remainderman; it imposes a condition, the happening of which replaces the remainderman with another. There is a fine line of distinction running through the reported cases in the District of Columbia. While the words "alternative" and "supplanting" are not used, the decisions requiring survival—holding the remainderman divested if he dies before the life tenants—involve wills with limitations similar to the examples given by the Restatement for alternative limitations. See, for example, Richardson v. Penicks,[2] Craig v. Rowland,[3] Fields v. Gwynn (an *inter vivos* trust),[4] and Jewell v. Graham.[5] Other cases have held that divestment occurs only when a remainderman fails to survive the preceding estate and leaves issue. If he died without issue before the end of the preceding estate, he is not divested. These involve limitations similar to the Restatement's examples of a supplanting limitation. See, for example, Hauptman v. Carpenter,[6] Young v. Munsey Trust Co.,[7] American Security & Trust Co. v. Sullivan,[8] Pyne v. Pyne,[9] and Phillips v. Behrens.[10]

The issue before us might be disposed of by resort to the technical language of the complicated rules reflected by the cases and the Restatement. But we venture in this instance to test briefly the reasoning which yields the rules. Suppose a testator named Kopac leaves his property in trust to pay the income to his wife for her life, and provides that "upon her death, all my property shall be transferred in fee simple absolute to my son, John, if he be then living, or to his children, if any such be then living." After his father dies, John is ready to take

1. The statute of descents in the District of Columbia was amended by an act of March 6, 1935, 49 Stat. 39, D.C.Code 1940, § 18—101 et seq.

2. 1893, 1 App.D.C. 261.

3. 1897, 10 App.D.C. 402.

4. 1901, 19 App.D.C. 99.

5. 1928, 57 App.D.C. 391, 24 F.2d 257, certiorari denied, 1928, 277 U.S. 596, 48 S.Ct. 559, 72 L.Ed. 1006.

6. 1900, 16 App.D.C. 524.

7. 1940, 72 App.D.C. 73, 111 F.2d 514.

8. D.C.1947, 72 F.Supp. 925.

9. 1946, 81 U.S.App.D.C. 11, 154 F.2d 297.

10. D.C.1948, 81 F.Supp. 347.

the property any time his mother might die; his interest is, therefore, a vested one under our statutory definition of vested interest.[11] If John dies leaving a child while Mrs. Kopac, Sr., is still living, that child is ready to take the property whenever its grandmother dies, and so its interest is vested as soon as John dies. But suppose John has no child and dies while Mrs. Kopac, Sr., is still living. According to the will, John must be living at his mother's death in order to take the property. So, while his interest is "vested" while he is living, he could take nothing unless he is living when his mother dies.[12] In other words, if John had no child and died while his mother was living, his other heirs, whoever they might be, would take nothing, because he had nothing to leave them. The property would "revert".[13] Such a provision in a will is an "alternative limitation", because under it either John or, in the alternative, his child would take the property, if either or both were living at Mrs. Kopac's death.

Now let us suppose that Mr. Kopac had written, "Upon my wife's death, all my property shall be transferred to my son, John, but if he has died before that time leaving a child, all my property shall then go to that child." [14] That provision leaves the property to John except for a combination of circumstances, which is that John has a child and then dies before Mrs. Kopac dies. In that event, the will says that the child should take the property. John could not (e. g., by a sale of his interest) circumvent the direction of the will and prevent the child from taking the property. But John does not have to survive his mother in order to take the property. He is "divested" of his interest only by the stated combination of events. This is called a "supplanting limitation", because the child supplants John as remainderman if John dies before Mrs. Kopac dies.[15] But sup-

11. 31 Stat. 1351 (1901), D.C.Code, § 45—812 (1940): "A future estate is vested when there is a person in being who would have an immediate right to the possession of the land upon the expiration of the intermediate or precedent estate, or upon the arrival of a certain period or event when it is to commence in possession. It is contingent when the person to whom or the event upon which it is limited to take effect in possession or become a vested estate is uncertain." The statute is in accord with the cases cited hereinabove in the text of this opinion. The doctrine of vesting remainders as early as possible is expounded in Doe ex dem. Poor v. Considine, 1868, 6 Wall. 458, 73 U.S. 458, 18 L.Ed. 869.

12. See Jewell v. Graham, supra. There the property was left to the testator's wife for life, then to his brother and two sisters for life, and on the death of the survivor the remainder was to go "to such of their children and descendants as may be living at the death of the survivor of them, * * * and in default of any such children or descendants, then the said stocks shall go to and be held by my next of kin according to the laws governing the distribution of intestates' personal property now in force in the District of Columbia". [57 App.D.C. 391, 24 F.2d 258] One of the remaindermen died before the expiration of the life estates, leaving a will. This court held that the testator's will required survival and that failure to survive divested the remainderman and, therefore, nothing passed under the deceased remainderman's will. See also Craig v. Rowland, supra.

13. Craig v. Rowland, supra; Jewell v. Graham, supra. See also Reeves v. American Security & Trust Co., 1940, 72 App.D.C. 403, 115 F.2d 145, certiorari denied, 1940, 311 U.S. 710, 61 S.Ct. 318, 85 L.Ed. 461, which involved the meaning of a will which was ambiguous because of faulty punctuation. Under the version adopted by this court, the remaindermen failed and the property reverted and passed under the residuary clause of the will.

14. See Pyne v. Pyne, supra, in which the will provided: ". . . if any one of my said three children, [A, B, and C], should die leaving a descendant or descendants, said descendant or descendants to take the share his, her or their parent would have taken had he lived." [81 U.S.App. D.C. 11, 154 F.2d 299] We held that A, B or C would be divested of his interest only if he failed to survive the life estate leaving issue.

15. See Young v. Munsey Trust Co., Pyne v. Pyne, and Phillips v. Behrens, supra, in each of which the court referred to another person's being substituted for

pose John has no child. In that event, the will does not say that he shall lose his interest if he dies before Mrs. Kopac. If he should die without a child, only one of the two events specified in the will would have occurred. In such a situation, John's interest would pass to his estate.[16]

■ From all the foregoing come the rules that in the absence of any named remainderman living at the expiration of the life estate, the property reverts in the case of an "alternative limitation"; and that in the case of a "supplanting limitation" the property passes to the heirs or devisees of the deceased remainderman. We must determine which type of limitation we have in the case at bar.

The language of the will in the case before us is "* * * to my grandchildren, or their descendants that shall then be living * * *." One could imagine many variations and combinations of circumstances which would pose a corresponding multitude of questions in the abstract in respect to that language. Our precise question, from the legal standpoint, is: There being no other grandchild of the testatrix, could Aubrey, dying without a descendant while the life tenants were living, have disposed of the remainder? Looking at the words of the will, the question is: Do the words "then * * * living" apply to Aubrey as well as to his descendants? We think that they do and that the will means that Aubrey must have been living at the death of the life tenants in order to have an irrevocable right to the remainder.

■ Much discussion before us in briefs and argument concerned the comma after "grandchildren" in the will. It is true that if that comma was placed by an authoritative perfectionist in the art of punctuation, and if such placement was the conscious design of the testatrix, it would present a most persuasive indication of the meaning of the phrase in which it appears. And the same is true in regard to

the significance of the "or" instead of a "but if, etc." But we think it unrealistic to give too much weight to such considerations. The will was obviously drawn by counsel. The punctuation and the minor connectives were his; perhaps the former was that of his secretary. Common experience tells us that it would be a most unusual occurrence if a testator should query the precise inference of meaning attaching to the placement of a comma in a document drawn by counsel. Moreover, in the will before us, the punctuator, whoever he was, appears to have deviated somewhat frequently from the orthodox; for example, he elsewhere in several expressions placed a comma before an "or" but not after the parenthetical phrase. Thus, in the same sentence which is immediately before us, he wrote "my said grandchildren, or their descendants to take per stirpes and not per capita". And again he wrote "* * * as in its opinion the interest of the trust, or the advantages of those interested seems to require, * * *." Construction pursuant to orthodox punctuation would leave those expressions in mid-air. Thus, we do not give too great consideration to the comma or to the "or" separate from context.

Rather, we find the meaning of the phrase from the intent derived from the whole of the will. It seems that the testatrix contemplated grandchildren other than Aubrey. Several times in the will she wrote of grandchildren and their descendants. Aubrey was in an institution for the mentally incompetent and hardly likely to have children. Moreover, and conclusively, if she did not contemplate other grandchildren, there was no discernible purpose in establishing the trust as she established it. We think that a fair test of her intent as to the disposition of the principal of her estate is to suppose that another grandchild had been born and was living when the life tenants died, Aubrey being then dead without a descendant.[17] In such case, would the living

---

the deceased remainderman on the happening of a given set of circumstances.

16. Hauptman v. Carpenter, supra; Phillips v. Behrens, supra.

17. See Jewell v. Graham, supra, 57 App. D.C. at page 396, 24 F.2d at page 262.

grandchild have taken only half the property, the other half going to the heirs or devisees of Aubrey? Or would the sole living grandchild have taken the whole property? We have no doubt that under such circumstances the living grandchild would take the whole estate. This seems clear to us from the scheme of the will and the evident intent that the property should go to the testatrix's descendants so long as there were any. This conclusion leads directly to a further conclusion that when Aubrey died without a descendant, during the lifetime of the life tenants, no part of the property remained in his estate.

■ From all these considerations, we are of opinion that when Aubrey died as he did, his interest in the testatrix's estate reverted.

The next problem is where the remainder interest went when it reverted at Aubrey's death. We must keep in mind two features of the situation. First, under no circumstance could the trustee come into full ownership of the property.[18] No matter what happened, the trustee held the property in trust. Under the terms of the will, so far as they went, when the life estate expired the trustee was to hold the property in trust for the purpose of transferring it to the designated remainderman, or -men, if there were any such. That would have been an express trust under the will. But if, at the expiration of the life estates, there were in existence no remainderman described in the will, the trustee would, nevertheless, hold the property in trust. Such a situation would

be, from the trustee's standpoint, a "resulting" trust.[19]

■ Second, the full beneficial interest in property held in trust is always owned by somebody or somebodies. This is one of the keys to our problem, and, because expressions in some authorities indicate a different view, we go back to basic reasoning for a test.

■ Land always has an owner. This proposition may not have been true in respect to ages prior to organized society and may not be true in respect to land not yet discovered by men. But, from the beginning of primitive society, when the hunting ground or pasture was regarded as collective domain, land has been regarded as belonging to somebody (or -bodies),[20] even if that somebody was the collective community. In the language of the ancients, land was never regarded as res nullius. All sorts of means and methods have been devised and used by various tribes and nations for the passage of that initial ownership. But no economic or legal concept that we know of contemplates the evaporation of that ownership into nothingness, out of the ken of all humankind.[21] Absent all other owners, the interest belongs to the state by right of escheat.[22] If a property owner—whether individual or state—dies or ceases to exist without transferring the property owned by him, the law transfers it for him.

From the foregoing major premise two conclusions are inescapable. (1) When an owner ceases to exist, his property passes to another owner. (2) While the ownership of property may be divided, no part

18. 3 Scott, Trusts, §§ 404, 411, 1939; Restatement, Trusts, § 411, 1935. See Union Trust Co. of Pittsburgh v. McCaughn, E.D.Pa.1927, 24 F.2d 459, 461: "The addition of the words 'in trust' absolutely negative the idea that he had any purpose that she should take a beneficial interest in the fund."

19. 3 Scott, Trusts, §§ 404, 411, 430.1 (1939); Union Trust Co. of Pittsburgh v. McCaughn, supra note 18; Stitzel-Weller Distillery v. Wickard, 1941, 73 App.D.C. 220, 118 F.2d 19; Hopkins v.

Grimshaw, 1897, 165 U.S. 342, 17 S.Ct. 401, 41 L.Ed. 739.

20. See Chapters 1 to 4, Vol. 1, Powell's Law of Real Property, 1949.

21. 1 Tiffany, Real Property, § 23, 3d Ed. 1939; Slack v. Downing, 1930, 233 Ky. 554, 26 S.W.2d 497; Hardin v. Sherley, 1942, 292 Ky. 275, 166 S.W.2d 425; Cornelison v. Yelton, 1944, 296 Ky. 501, 177 S.W.2d 879.

22. Restatement, Trusts, § 411, Comment f; 3 Scott, Trusts, § 411.4, 1939.

of that ownership ever dissolves into entire non-existence.

■ Ownership may be split, in our jurisprudence, into what we call legal interests and beneficial interests; and the beneficial interest may be split, as, for example, into rights to income and rights to principal. But, however much it may be divided, none of it is ever lost or destroyed. Thus, it follows that that portion of the beneficial interest which consists of the right to receive the principal of a trust estate, always belongs to somebody. It may be difficult to ascertain the person to whom that right belongs, but there is no such thing as property held in trust without anybody being entitled to the principal if the trust expires.

The right to the principal of an estate at any given moment may be in a series of people depending upon gradations of contingencies. Thus, A may be entitled to the principal, but if A is not living B may be entitled to it, and if neither A nor B is living C may be entitled, and if neither A, B nor C is living D may take, and so on to the final ultimate contingency when the state is entitled to the property. All these persons own their increasingly contingent and remote rights at the same time. A, B, C, etc., each and all have prospects in the property at all times until one of them takes in possession and full ownership. Thus, there may be an *echelon* of persons with rights in diminishing probability as their respective possibilities of taking become more remote. The sum total of all these outstanding rights in property at any given moment must be the full beneficial interest. To express that idea another way, in contemplation of law no circumstance can occur which would leave property, held in trust, with no taker if the trust expires.

■ These rights to take the principal of a trust estate may be certain, fixed, probable, irrevocable, uncertain, contingent, revocable, improbable, remote. But whatever their respective peculiarities, they are interests in property. As such, they

pass from person to person, by intentional transfer or by operation of law; they do not spring full-grown out of space without precedent existence and ownership.[23] So it is that at any given moment, under any conceivable circumstance or combination of circumstances, if a trust expires some person is entitled to take the trust property, and he is so entitled by virtue of a right which came to him from somebody else.

To appreciate the realities implicit in that legal concept, one has only to read the opinions and decisions in Estate of Spiegel v. Commissioner.[24] Spiegel created a trust the income of which was to be paid to his children or their surviving children during his lifetime, and thereafter the principal was to be transferred to his children or their surviving children. He had three children and three grandchildren. The possibility that the principal would again belong to him was the remote one that he would outlive all his children and all his grandchildren. Despite this remoteness, the Court held that the passage of that possibility upon Spiegel's death was of sufficient substance to require the inclusion of the value of the trust property in his estate for federal estate tax purposes. To alienate all of a settlor's interest, the Court held, he must absolutely, unequivocally, irrevocably and without possible reservation part with all his title, possession and enjoyment, so that he is left with no present legal title, no possible reversionary interest in that title, and no right to possess or enjoy the property then or thereafter; and it is immaterial whether a contingent future interest remains in the settlor because he reserves it or because, without considering the consequences, he fails to convey away all the attributes of his property, present and prospective.

■ We said that this very general proposition we have been discussing is one of the keys to our problem. It is so because it establishes that the ultimate right to take the principal of this estate must

23. See cases cited note 21 supra.

24. 1949, 335 U.S. 701, 69 S.Ct. 301, 93 L.Ed. 330.

be traced from its original owner from person to person to the final taker. We cannot pick up the right out of thin air and bestow it on some selected person. There are some authorities which, on first impression, seem to contradict this principle.[25] They hold that a possibility of reverter is not an estate in land, cannot be devised or assigned, and is not capable of inheritance. They hold that it is merely a possibility that an estate will arise and that, when the contingency occurs which makes the property revert, the possibility becomes a reality and those who are the heirs of the grantor at that time are entitled to possession. Thus, they appear to hold that the possibility of reverter is suspended after the grantor dies and remains in abeyance until the contingency occurs which makes the property revert, at which time it attaches as an estate to one qualifying as the heir of the original grantor. However, when other authorities, which go into the problem in more detail, are examined, it is abundantly clear that a possibility of reverter is not held in suspension. [26] These latter cases reach the same conclusion as do those cited in footnote 25, but the reasons for the conclusion differ. As stated in Conner v. Waring,[27] one may inherit only through the person last seized of an estate of inheritance. If there be an intermediate heir not so seized, the claimant may not inherit through him; he must claim by descent through the grantor, the last person seized of the estate. This is the common-law rule, and it in no wise destroys the basic concept that someone at all times owns the whole of the bundle of rights, interests and estates which make up complete ownership. At all times someone owns the possibility of reverter, whether it passes directly from the preceding heir or to an heir of the person last seized. At any given time, if events happen which

cause the property to revert, there is someone who is qualified to take it.

With these general principles in mind, we return to the case at bar. There was always the possibility that Aubrey and the life tenants might die without another grandchild of the testatrix.being in existence. There was always a person who had the right to take the property if such a contingency developed. The testatrix did not provide in the will for this contingency. So, to the extent of this possibility, her stated disposition of the property was not complete. To that slight and limited extent, she left herself intestate.

The next question is where this possibility went when the testatrix died. Since it was a part of an estate in fee simple of which she died seized, and since she made no testamentary disposition of it, it descended to her heirs at law. At this point we do not have the problem of a possibility of reverter in the ownership of an intermediate heir who dies intestate. The possibility here was one which, at this point, was in the original grantor.

The three children of the testatrix being her heirs at law, the possibility passed to them. It remained in them throughout Aubrey's life. When he died, the possibility became less remote but remained a possibility rather than an actual reversion, because there was always a possibility, in contemplation of law if not in fact, that a grandchild might be born who would take the whole remainder.[28] There being no survivor clause in the will respecting the principal of the trust estate, in so far as the three children were concerned, each of them died owning a possibility of reverter in one-third of the estate.

The next question is where these three fractional possibilities went when the respective owner-children died. A possibility of reverter is not an estate under the

25. Blount v. Walker, 1889, 31 S.C. 13, 9 S.E. 804; Union Colony Co. of Colorado v. Gallie, 1939, 104 Colo. 46, 88 P.2d 120; Burnett v. Snoddy, 1942, 199 S.C. 399, 19 S.E.2d 904.

26. Conner v. Waring, 1880, 52 Md. 724; Copenhaver v. Pendleton, 1930, 155 Va. 433, 155 S.E. 802, 77 A.L.R. 324.

27. Supra note 26.

28. United States v. Provident Trust Co., 1934, 291 U.S. 272, 78 L.Ed. 793, 54 S.Ct. 389.

District Code, but it is an interest in property. The Code provides that "Any interest in" property may be disposed of by deed or will.[29] Each of the three children of testatrix left a will containing a general residuary clause which disposed of all interests in property owned by them and not otherwise disposed of. These clauses transferred the several possibilities of reverter to the designated residual devisees. We do not have at this point the problem of an intermediate intestate heir; in other words, we are not faced with the question whether an interest in an estate of which the deceased was not seized could descend.

We conclude that upon the termination of the life estates in the case before us the property passed in three equal parts to the residuary devisees of the three heirs of the testatrix, William, Evelyn and Rita. The judgment of the District Court will be reversed and the case remanded for entry of a decree in accordance with this opinion.

Reversed and remanded.

29. D.C.Code, § 45—101 (1940).